**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JAMES KIRTLEY SMITH**
727 Hobart Place NW, Apt. 2
Washington, DC 20001,

Plaintiff,

v.

**CROWDSTRIKE, INC.**
150 Mathilda Place, Suite 300
Sunnyvale, California 94086,

and

**CROWDSTRIKE HOLDINGS, INC.**
206 East 9th Street, Suite 1400
Austin, Texas 78701,

Defendants.

**SERVE BOTH DEFENDANTS ON:**
Corporation Service Company, Registered Agent
1156 15th Street NW, Suite 605
Washington, DC 20005

Civil Action No. ____________

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff James Kirtley ("Kirt") Smith ("Plaintiff" or "Mr. Smith"), through counsel, brings this Complaint against Defendants CrowdStrike, Inc. and CrowdStrike Holdings, Inc. (together, "CrowdStrike" or "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for disability discrimination, failure to accommodate, retaliation, and hostile work environment under Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the District of Columbia Human Rights Act,

D.C. Code § 2-1401.01 *et seq.* ("DCHRA"). It also asserts interference and retaliation claims under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA").

2. CrowdStrike recruited Mr. Smith, a Mandarin-speaking China threat analyst, to serve as a Senior Intelligence Analyst. He performed that work remotely from his home in the District of Columbia. After Mr. Smith disclosed his anxiety and depression, complained that his managers were treating him in a hostile and discriminatory way, and asked for accommodations recommended by his physician, CrowdStrike refused nearly every accommodation his physician recommended and returned him to the same managers. CrowdStrike then fired him on July 30, 2025, sixteen days after he returned from medical leave, in the middle of the phased return to work it had agreed to, and about an hour and a half before his first work product since his return was due.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's ADA and FMLA claims arise under federal law, and under 42 U.S.C. § 12117(a) and 29 U.S.C. § 2617(a)(2). The Court has supplemental jurisdiction over the DCHRA claim under 28 U.S.C. § 1367(a) because it forms part of the same case or controversy as the federal claims.

4. This Court has personal jurisdiction over Defendants under D.C. Code § 13-423(a)(1). CrowdStrike transacted business in the District by employing Mr. Smith to work from the District, directing his work to him in the District, and administering his leave and accommodations at his District residence. CrowdStrike's leave administrator evaluated his leave under the D.C. Family and Medical Leave Act. CrowdStrike terminated Mr. Smith while he worked in the District.

5. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3), as incorporated by 42 U.S.C. § 12117(a), because the unlawful employment practices were committed in the District, Mr. Smith worked in the District, and he would have continued to work in the District but for those practices. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the District.

## PARTIES

6. Plaintiff James Kirtley Smith is an adult who resides at 727 Hobart Place NW, Apt. 2, Washington, DC 20001. He lived and worked in the District at all relevant times.

7. Defendant CrowdStrike, Inc. is a Delaware corporation with its principal office at 150 Mathilda Place, Suite 300, Sunnyvale, California 94086. CrowdStrike, Inc. was Mr. Smith's employer of record and the counterparty to his At-Will Employment, Non-Disclosure, Invention Assignment, and Restrictive Covenant Agreement, which Mr. Smith signed on March 20, 2024.

8. Defendant CrowdStrike Holdings, Inc. is a Delaware corporation with its principal office at 206 East 9th Street, Suite 1400, Austin, Texas 78701. CrowdStrike Holdings, Inc. is the publicly traded parent of CrowdStrike, Inc. It was the respondent named in Mr. Smith's Charge of Discrimination.

9. On information and belief, CrowdStrike Holdings, Inc. and CrowdStrike, Inc. operate as a single, integrated enterprise. They share common ownership, common senior management, centralized human resources and employee relations functions, a common Leave and ADA team, and common employment policies, including the anti-discrimination, complaint, and reasonable accommodation policies that governed Mr. Smith's employment. The same CrowdStrike personnel handled Mr. Smith's leave, accommodation requests, internal complaint, and termination, and the same outside counsel responded to his Charge on behalf of both entities.

10. Each Defendant is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A), 29 U.S.C. § 2611(4), and D.C. Code § 2-1401.02(10). CrowdStrike employs more than 500 employees and employed more than 50 employees in each of twenty or more calendar workweeks in each relevant year.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

11. On April 24, 2026, Mr. Smith filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 556-2026-00596, alleging disability discrimination, failure to accommodate, retaliation, hostile work environment, and wrongful termination. A copy of the Charge is attached as Exhibit A.

12. The Charge was filed within 300 days of Mr. Smith's July 30, 2025 termination and the other unlawful employment practices within that period. The District of Columbia has a state or local agency with authority to grant or seek relief from disability discrimination, the D.C. Office of Human Rights.

13. The EEOC served the Charge on CrowdStrike. CrowdStrike, through counsel, submitted a position statement to the EEOC on June 11, 2026. The EEOC processed the Charge as against both CrowdStrike Holdings, Inc. and CrowdStrike, Inc. Both Defendants had actual notice of the Charge and an opportunity to participate in conciliation.

14. On August 13, 2026, the EEOC issued Mr. Smith a Determination and Notice of Rights dismissing the Charge and notifying him of his right to sue. A copy is attached as Exhibit B.

15. Mr. Smith filed this action within ninety days* of receiving the Notice of Right to Sue. 42 U.S.C. § 2000e-5(f)(1), as incorporated by 42 U.S.C. § 12117(a). All conditions precedent to this action have been satisfied.

16. The FMLA does not require administrative exhaustion. Mr. Smith's FMLA claims are timely under 29 U.S.C. § 2617(c), and his DCHRA claim is timely under D.C. Code § 2-1403.16(b)(1).

## FACTUAL ALLEGATIONS

### A. CrowdStrike recruits Mr. Smith, and he excels.

17. CrowdStrike recruited Mr. Smith while he was employed elsewhere. Kazu Koyama, who later became Mr. Smith's direct manager, sought him out for the role.

18. Mr. Smith began work on or about April 22, 2024, as a full-time Senior Intelligence Analyst. He researched, analyzed, and wrote intelligence reports for CrowdStrike's customers on cyber threats from China-based adversaries, drawing on Chinese-language primary sources.

19. Mr. Smith reported to Mr. Koyama throughout his employment. Mr. Koyama reported to Morgan Diakun, Mr. Smith's second-level manager.

20. At all relevant times, Mr. Koyama; Mr. Diakun; Joshua Peterson, CrowdStrike's Senior Manager for Leaves, Accommodations and Time-off Programs; Virginia Rogness, a Human Resources Generalist; Megan Johnson, a Senior Employee Relations Partner; and CrowdStrike's head of Human Resources acted within the scope of their employment and as CrowdStrike's agents.

---

* The deadline to file this complaint fell on a holiday (FRCP 6(a)(6)(A)). This Complaint is filed on the next business day pursuant to FRCP 6(a)(3)(A).

21. Like most CrowdStrike employees, Mr. Smith worked fully remotely, from his home in the District of Columbia. He received assignments, produced work, and communicated with CrowdStrike personnel and customers from the District. CrowdStrike confirmed in writing in June 2025 that he would "continue to be a remote worker" and was "generally not required to come into a CrowdStrike office."

22. Mr. Smith was qualified for his position and could perform its essential functions, with or without reasonable accommodation.

23. In 2024, Mr. Smith completed CrowdStrike's internal leadership development program, Falcon Ignite, with praise from the program's leadership, and received a reward.

24. Mr. Smith later received an internal award recognizing his performance.

25. Stephen Williams, a Senior Intelligence Analyst on CrowdStrike's team serving its most prominent customers, sent a group message tagging Mr. Koyama and Mr. Diakun. Mr. Williams reported that he had just finished a call with a customer who gave "glowing feedback" on Mr. Smith's work, expressed deep appreciation for his analysis, and asked for more work of the same caliber.

26. Mr. Koyama and Mr. Diakun did not acknowledge or credit the praise. Instead, they continued their mistreatment of Mr. Smith and treated his work as not praiseworthy.

**B. Mr. Smith's disabilities.**

27. Mr. Smith has Generalized Anxiety Disorder ("GAD"), first diagnosed in 2015, and Major Depressive Disorder ("MDD"), diagnosed in 2022. His symptoms include chronic and intrusive worry, impaired sleep, persistent low mood, diminished concentration, decreased executive functioning, difficulty sustaining cognitive engagement, emotional fatigue, and rumination.

28. These impairments substantially limit major life activities, including concentrating, thinking, sleeping, interacting with others, and working, and the operation of major bodily functions, including brain function. 42 U.S.C. § 12102(2). These conditions are episodic, and when active they substantially limit those activities. 42 U.S.C. § 12102(4)(D).

29. On May 23, 2025, while on medical leave, Mr. Smith was admitted for inpatient care to the Psychiatric Institute of Washington in the District of Columbia. This admission was precipitated by an email from CrowdStrike.

30. Mr. Smith has a record of these impairments, and CrowdStrike regarded him as having them. 42 U.S.C. § 12102(1)(B), (C).

**C. Mr. Smith discloses his conditions and complains, and his managers escalate.**

31. Beginning in or about August 2024, Mr. Koyama subjected Mr. Smith to escalating verbal mistreatment, micromanagement, and heightened monitoring of his drafts and work.

32. By no later than December 2024, Mr. Smith told Mr. Koyama, Mr. Diakun, his coworkers, and Human Resources that his mental health conditions were affecting his work.

33. After that disclosure, Mr. Koyama and Mr. Diakun intensified their scrutiny and criticism of Mr. Smith, threatened discipline, and treated him as weak and "less than" because of his conditions, despite the quality of his work and the recognition it had earned.

34. Less than 48 hours after Mr. Smith received his internal performance award, management raised placing him on a Performance Improvement Plan ("PIP"). The proposed PIP was inconsistent with his documented performance and recognition.

35. In January 2025, Mr. Diakun and Mr. Koyama convened a meeting with Mr. Smith and Human Resources to discuss the PIP. Mr. Smith told CrowdStrike that he did not agree with the PIP and declined to proceed with the meeting without counsel.

36. In or about January 2025, Mr. Smith complained to Human Resources that he was being subjected to discrimination, a hostile work environment, and retaliation by Mr. Koyama and Mr. Diakun. He reported Mr. Koyama for creating a hostile work environment and Mr. Diakun for contributing to it and for retaliatory conduct.

**D. Medical leave.**

37. Mr. Smith's physician placed him on medical leave beginning January 20, 2025. His last day worked before the leave was January 17, 2025.

38. CrowdStrike's leave administrator, FMLA Source, approved the leave from January 20 through April 21, 2025, as leave under the ADA, because Mr. Smith had not yet completed one year of employment.

39. Mr. Smith reached his one-year anniversary on April 22, 2025. CrowdStrike's leave administrator then approved his continued leave under the FMLA and the D.C. Family and Medical Leave Act beginning April 22, 2025, through at least June 16, 2025.

40. Employee Relations told Mr. Smith, after his leave began, that its investigation of his complaint would be paused until his return. On May 20, 2025, without his input, Employee Relations told him that it had found no policy violation and considered the investigation complete.

**E. CrowdStrike refuses the accommodations his physician recommended.**

41. During his leave, Mr. Smith, his physician, Dr. Christopher Magliulo, and Mr. Peterson exchanged correspondence about the accommodations Mr. Smith would need to return to work safely.

42. Mr. Smith asked to be supervised by another CrowdStrike manager instead of Mr. Koyama. On May 2, 2025, CrowdStrike refused, stating that only Mr. Koyama had China and

Asia-Pacific expertise and that a different reporting line would require additional review by Mr. Koyama.

43. CrowdStrike instead offered three options: a graduated return-to-work schedule; additional support from Mr. Diakun during Mr. Smith's one-on-one meetings with Mr. Koyama; and extended one-on-one meetings with Mr. Diakun during his first month back. Each option kept Mr. Smith under the two managers he had reported.

44. On May 13, 2025, Mr. Smith wrote to CrowdStrike's Leave and ADA team, copying Employee Relations and Human Resources, that he had formally reported Mr. Koyama for creating a hostile work environment and Mr. Diakun for contributing to it and engaging in retaliatory behavior. He asked what concrete safeguards would apply if he returned under them: what checks and balances would ensure impartial oversight, what protocols would identify retaliation, whether a neutral third party would monitor and document, and what protected escalation channels he would have.

45. On May 16, 2025, CrowdStrike answered only that his HR business partner and CrowdStrike's ethics hotline would remain available. Those were the same channels through which Mr. Smith had already complained while the mistreatment continued.

46. On May 21, 2025, Mr. Peterson wrote that CrowdStrike "presume[d]" Mr. Smith would return on May 27, 2025, under the existing reporting structure, that there were "no other open roles within the CAO organization for which you are currently qualified," and that management wanted to address "significant performance issues" from before his leave. CrowdStrike thus tied his accommodation request to alleged performance concerns.

47. On June 5, 2025, Mr. Smith accepted, in good faith, the graduated return-to-work schedule and additional support in his meetings, while his physician evaluated further accommodations.

48. On June 12, 2025, Mr. Smith submitted a return-to-work authorization from Dr. Magliulo releasing him to restricted duty beginning June 16, 2025, with a letter of recommended accommodations. Dr. Magliulo submitted an amended letter on June 16, 2025, explaining that the accommodations were clinically indicated to prevent relapse and reduce exposure to destabilizing stimuli.

49. Dr. Magliulo recommended, among other things: a graduated return-to-work schedule; routing Mr. Koyama’s feedback through, and having one-on-one meetings attended by, a neutral third party; evaluating Mr. Smith on final work product rather than draft history; a 48-hour grace period for non-urgent internal communications; the ability to request peer or technical review without penalty; flexibility with interim internal deadlines for internal deliverables, without changing any external, contractual, or year-end deadline; an HR-approved peer support contact; continued fully remote work; and consistent, objective, documented feedback.

50. On June 16, 2025, the day Mr. Smith’s physician released him to return, CrowdStrike told him he could not return as scheduled and that the period would be treated as unpaid leave while it reviewed his accommodation requests.

51. On June 20, 2025, CrowdStrike rejected most of the physician’s recommendations. It refused the neutral third party, the evaluation protections, the 48-hour grace period, the interim-deadline flexibility, and the peer support contact. It stated that Employee Relations had found no policy violation and again referred to “significant performance issues” from before his leave.

52. CrowdStrike offered only an four-week phased return (two weeks of four-hour days, then two weeks of six-hour days), with the non-working hours unpaid with the option to use sick leave, and continued meetings with Mr. Koyama and Mr. Diakun. It stated that peer review would be available only "within reason and subject to business needs as determined by your management," meaning by Mr. Koyama and Mr. Diakun. These so called accommodations mirrored the terms of the PIP CrowdStrike intended to implement on January 3, 2025.

53. On June 24, 2025, Mr. Smith told CrowdStrike he was "very concerned that the Company is choosing not to provide me with the medical accommodations as recommended by my physician," objected to CrowdStrike mixing alleged performance issues into the accommodation process, and confirmed he would return. CrowdStrike responded that it would consider further accommodation requests.

54. On June 27, 2025, Mr. Smith declined joint meetings with both Mr. Koyama and Mr. Diakun, explaining that that dynamic had contributed to the decline that led to his leave. On June 30, 2025, CrowdStrike agreed to regular one-on-one meetings with Mr. Koyama attended by Ms. Rogness, extended one-on-one meetings with Mr. Diakun during his first month back, and the four-week phased schedule, while reserving the right to hold joint meetings "as business dictates."

55. CrowdStrike did not offer effective alternatives to the accommodations it refused, although effective accommodations were available and would not have imposed an undue hardship on a company with more than 10,000 employees.

56. While the accommodation process was ongoing and before Mr. Smith's return, CrowdStrike posted his position and began recruiting candidates to replace him. The June 27 Career China newsletter listed a Senior Intelligence Analyst, Asia-Pacific Mission role. Seven

individuals contacted Mr. Smith regarding CrowdStrike opportunities prior to his July 30 termination.

**F. Mr. Smith returns, and CrowdStrike does not restore his access.**

57. On May 29, 2025, CrowdStrike told Mr. Smith that reactivating his systems access would "take time."

58. Mr. Smith submitted his physician's return-to-work authorization on July 9, 2025. CrowdStrike delayed his return again to obtain a revised form. On July 10, 2025, CrowdStrike confirmed that the return-to-work requirements were met and set his return for Monday, July 14, 2025.

59. Mr. Smith returned to work on July 14, 2025, in good faith and in reliance on the agreed accommodations. He was ready and able to perform the essential functions of his position.

60. During his first two weeks back, Mr. Smith could not fully access CrowdStrike's systems. He contacted IT repeatedly and was told he should be up and running. IT told him that his credentials had not been fully entered into CrowdStrike's systems until July 29, 2025.

61. Mr. Smith was late to two internal meetings during this period because of the access problems that CrowdStrike had not resolved.

**G. CrowdStrike fires Mr. Smith.**

62. On July 30, 2025, sixteen days after his return, Mr. Smith was preparing to submit his first work product since returning and was about an hour and a half from his deadline.

63. That day, Mr. Diakun and CrowdStrike's head of Human Resources called Mr. Smith into a meeting and terminated his employment.

64. They stated or implied that the main reasons were that Mr. Smith was not up to speed on changes that occurred during his leave and that he had been late to internal meetings.

65. Mr. Smith was terminated in the third week of the four-week phased return CrowdStrike had agreed to, and during the first month of extended meetings CrowdStrike had promised.

66. The stated reasons are false and pretextual. Not being up to speed on changes during his leave is a reason that penalizes Mr. Smith for taking medical leave. Any lateness resulted from CrowdStrike's own failure to restore his access. The reasons are inconsistent with his recognition and customer praise, with the reduced schedule CrowdStrike had approved, and with CrowdStrike's statement that it would consider further accommodations after his return.

67. CrowdStrike had pre-approved a $4,982 professional development course for Mr. Smith. CrowdStrike terminated him the day before the reimbursement would have been processed and has not reimbursed him.

68. CrowdStrike did not rehire Mr. Smith or offer him any other position.

### H. Harm.

69. As a direct result of CrowdStrike's conduct, Mr. Smith has lost wages, bonuses, and benefits, including a base salary of approximately $133,000 per year, and has lost professional opportunities. He has suffered emotional distress, worsening of his anxiety and depression, humiliation, and damage to his professional reputation.

70. CrowdStrike acted with malice or with reckless indifference to Mr. Smith's federally protected rights. 42 U.S.C. § 1981a(b)(1).

## FIRST CLAIM FOR RELIEF

## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
(42 U.S.C. § 12112(a), (b)(5)(B); Against All Defendants)

71. Plaintiff incorporates the preceding paragraphs.

72. Mr. Smith is an individual with a disability under 42 U.S.C. § 12102(1)(A), (B), and (C).

73. Mr. Smith was a qualified individual who could perform the essential functions of his position with or without reasonable accommodation. 42 U.S.C. § 12111(8).

74. CrowdStrike discriminated against Mr. Smith because of his disability, including by terminating him, refusing to rehire him, and placing him on unpaid leave rather than returning him to work when his physician released him. CrowdStrike also terminated him in part because of his need to make reasonable accommodation for his impairments. 42 U.S.C. § 12112(b)(5)(B).

75. The circumstances support an inference of discrimination, including the timing of the termination sixteen days after his return from disability-related leave, the reason that he was not up to speed after his leave, CrowdStrike's failure to restore his access, and the posting of his position before his return.

76. CrowdStrike's conduct caused Mr. Smith the harm described above and was undertaken with malice or reckless indifference to his federally protected rights.

## SECOND CLAIM FOR RELIEF

## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA

(42 U.S.C. § 12112(b)(5)(A); Against All Defendants)

77. Plaintiff incorporates the preceding paragraphs.

78. CrowdStrike knew of Mr. Smith's disabilities and limitations from his disclosures and his physician's letters.

79. Mr. Smith and his physician requested reasonable accommodations, including a 48-hour grace period for non-urgent internal communications; flexibility with interim internal deadlines; peer or technical review without penalty; evaluation on final work product; a neutral third party in his interactions with Mr. Koyama; and, as one alternative, supervision by another

manager. With these accommodations, Mr. Smith could have performed the essential functions of his position.

80. CrowdStrike refused these accommodations, offered none that addressed the limitations they were meant to address, and did not engage in a good-faith interactive process. CrowdStrike's failure to accommodate continued through Mr. Smith's return to work and termination.

81. CrowdStrike also denied Mr. Smith the accommodations it had granted by terminating him during the phased return and the first month of extended meetings, and by failing to restore his systems access in full when he returned.

82. The requested accommodations were reasonable and would not have imposed an undue hardship on CrowdStrike.

83. CrowdStrike's conduct caused Mr. Smith the harm described above and was undertaken with malice or reckless indifference to his federally protected rights. CrowdStrike did not make good-faith efforts to accommodate him. 42 U.S.C. § 1981a(a)(3).

**THIRD CLAIM FOR RELIEF**

**RETALIATION AND INTERFERENCE IN VIOLATION OF THE ADA**
(42 U.S.C. § 12203(a), (b); Against All Defendants)

84. Plaintiff incorporates the preceding paragraphs.

85. Mr. Smith engaged in protected activity, including requesting reasonable accommodations; complaining to Human Resources and Employee Relations that he was being subjected to discrimination, a hostile work environment, and retaliation; and objecting to CrowdStrike's refusal of his physician's recommended accommodations.

86. CrowdStrike took materially adverse actions against Mr. Smith that would dissuade a reasonable employee from engaging in protected activity, including threatening a PIP, closing

the investigation of his complaint without his participation, refusing effective accommodations, placing him on unpaid leave, tying his accommodation requests to alleged performance issues, terminating him, and refusing to rehire him.

87. The decision-makers knew of Mr. Smith's protected activity. The termination came sixteen days after his return, weeks after his written objections to the denial of accommodations, and while the accommodation process was ongoing. The stated reasons are pretextual.

88. CrowdStrike also coerced, intimidated, threatened, and interfered with Mr. Smith in the exercise and enjoyment of his ADA rights. 42 U.S.C. § 12203(b).

89. CrowdStrike's conduct caused Mr. Smith the harm described above.

**FOURTH CLAIM FOR RELIEF**

**HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADA**
(42 U.S.C. §§ 12112(a), 12203; Against All Defendants)

90. Plaintiff incorporates the preceding paragraphs.

91. Mr. Smith was subjected to unwelcome conduct because of his disability and his protected activity, including heightened monitoring, repeated criticism, threats of discipline, and verbal mistreatment by his direct and second-level managers; dismissal of customer praise of his work; treatment of him as weak because of his conditions; and, after he reported them, CrowdStrike's insistence that he remain under the same managers without effective safeguards.

92. The conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. It worsened his symptoms and contributed to his need for medical leave and inpatient care.

93. The harassment culminated in a tangible employment action, his termination. CrowdStrike also knew of the harassment through Mr. Smith's complaints and failed to take prompt and effective corrective action.

94. The hostile work environment was a continuing course of conduct, at least one act of which occurred within 300 days before Mr. Smith filed his Charge.

95. CrowdStrike's conduct caused Mr. Smith the harm described above and was undertaken with malice or reckless indifference to his federally protected rights.

**FIFTH CLAIM FOR RELIEF**

**INTERFERENCE AND RETALIATION IN VIOLATION OF THE FMLA**
(29 U.S.C. § 2615(a)(1), (a)(2); 29 C.F.R. § 825.220(c); Against All Defendants)

96. Plaintiff incorporates the preceding paragraphs.

97. CrowdStrike is an employer under 29 U.S.C. § 2611(4).

98. Mr. Smith was an eligible employee under 29 U.S.C. § 2611(2). He had been employed by CrowdStrike for at least twelve months as of April 22, 2025, and had worked at least 1,250 hours during the preceding twelve months. Because Mr. Smith worked remotely, his worksite for FMLA purposes was the CrowdStrike office to which he reported or from which his assignments were made. 29 C.F.R. § 825.111(a)(2). On information and belief, that worksite was CrowdStrike's Virginia office at 2450 Crystal Drive, Suite 1015, Arlington, Virginia 22227, which is within 75 miles of the District. On information and belief, CrowdStrike employed at least 50 employees within 75 miles of that worksite, including remote employees who, like Mr. Smith, reported to or received assignments from that office.

99. CrowdStrike's leave administrator determined that Mr. Smith was eligible for FMLA leave and approved FMLA leave for his own serious health condition beginning April 22, 2025. 29 U.S.C. § 2612(a)(1)(D).

100. CrowdStrike interfered with Mr. Smith's FMLA rights, including by refusing to restore him to his position on June 16, 2025, when his physician released him to return, and by terminating him shortly after his return for reasons tied to his leave.

101. CrowdStrike retaliated against Mr. Smith for taking FMLA leave. CrowdStrike told him that a main reason for his termination was that he was not up to speed on changes that occurred while he was on leave. Using FMLA leave as a negative factor in an employment decision violates the FMLA. 29 C.F.R. § 825.220(c).

102. CrowdStrike cannot show that it acted in good faith and with reasonable grounds for believing that its conduct did not violate the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii). Its violations were willful.

103. As a result, Mr. Smith has lost wages, benefits, and other compensation. He is entitled to those losses with interest, an equal amount as liquidated damages, equitable relief including reinstatement or front pay, and reasonable attorney's fees, expert witness fees, and costs. 29 U.S.C. § 2617(a)(1), (a)(3).

## SIXTH CLAIM FOR RELIEF

### DISCRIMINATION, FAILURE TO ACCOMMODATE, HOSTILE WORK ENVIRONMENT, AND RETALIATION IN VIOLATION OF THE DCHRA

(D.C. Code §§ 2-1402.11, 2-1402.61; Against All Defendants)

104. Plaintiff incorporates the preceding paragraphs.

105. Mr. Smith has a disability within the meaning of D.C. Code § 2-1401.02(5A) and worked for CrowdStrike in the District.

106. The DCHRA makes it unlawful for an employer to discharge or otherwise discriminate against an employee, wholly or partially for a discriminatory reason based on disability. D.C. Code § 2-1402.11(a)(1). CrowdStrike violated that provision by terminating Mr. Smith, refusing to rehire him, failing to provide reasonable accommodation, and subjecting him to a hostile work environment.

107. The DCHRA also makes it unlawful to retaliate against, coerce, threaten, or interfere with any person for exercising or enjoying rights protected by the DCHRA, or for opposing practices it prohibits. D.C. Code § 2-1402.61. CrowdStrike retaliated against Mr. Smith because he requested accommodation and complained of discrimination and retaliation.

108. This claim is timely. Mr. Smith filed it within two years of the unlawful discriminatory acts, including his July 30, 2025 termination. D.C. Code § 2-1403.16(b)(1).

109. CrowdStrike's conduct was intentional, willful, and undertaken with malice or reckless disregard of Mr. Smith's rights, and it caused him the harm described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and award, without duplication:

(a) A declaration that Defendants violated the ADA, the FMLA, and the DCHRA;

(b) Back pay, lost bonuses, and lost benefits and other compensation, including the $5,000 professional development reimbursement, with pre-judgment and post-judgment interest;

(c) Reinstatement or, in lieu of reinstatement, front pay;

(d) Liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii) on the FMLA claim;

(e) Compensatory damages for emotional distress, reputational harm, and other non-pecuniary losses, under 42 U.S.C. § 1981a on the ADA claims and without statutory cap under D.C. Code § 2-1403.13(a)(1)(D) on the DCHRA claim;

(f) Punitive damages under 42 U.S.C. § 1981a(b)(1) on the ADA claims to the extent permitted by law, and under D.C. Code § 2-1403.16(f) on the DCHRA claim;

(g) Reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 12205, 29 U.S.C. § 2617(a)(3), and D.C. Code § 2-1403.13(a)(1)(E); and

(h) Such other relief as the Court deems just and proper.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38(b) and 42 U.S.C. § 1981a(c), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Theresa Kraft*

Theresa Kraft (D.C. Bar No. 1741565)
TOIKKA KRAFT LAW GROUP LLP
1629 K Street NW, Suite 300
Washington, DC 20006
Tel.: (202) 508-3648
Fax: (202) 521-9803
tkraft@tk-lawgroup.com

*Counsel for Plaintiff James Kirtley Smith*

**EXHIBITS**

Exhibit A: Charge of Discrimination, EEOC Charge No. 556-2026-00596, filed April 24, 2026
Exhibit B: EEOC Determination and Notice of Rights, issued August 13, 2026